**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 4 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellant,

v.

    No. 02-5151

DOUGLAS REITMEYER; DON SPARKMAN;
JAMES ALTON WATSON; DANIEL JOSEPH
EATON; JAMES ROGER CRADDOCK;
NORTH AMERICAN CONSTRUCTION
CORPORATION; EVI CHARRINGTON
ENVIRONMENTAL, INC.,

    Defendants-Appellees.

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 02-CR-32-EA)**

---

Richard A. Friedman (David E. O'Meilia, United States Attorney; Kenneth P.
Snoke, Assistant United States Attorney; Douglas A. Horn, Assistant United
States Attorney, Tulsa, Oklahoma, with him on the briefs), Department of Justice,
Washington, D.C., for Plaintiff-Appellant.

R. Thomas Seymour (C. Robert Burton, IV, of Seymour Law Firm, Tulsa,
Oklahoma, with him on the brief for Defendant-Appellee Reitmeyer; James C.
Lang, G. Steven Stidham, and Brian S. Gaskill of Sneed Lang, P.C., Tulsa,
Oklahoma, on the brief for Defendant-Appellee James Alton Watson; John E.
Dowdell and Marichiel A. Lewis of Norman Wohlgemuth Chandler & Dowdell,
Tulsa, Oklahoma, on the brief for Defendant-Appellee Joseph Eaton; William G.
Rosch III of Rosch & Ross, Houston, Texas, on the brief for Defendant-Appellee
James Roger Craddock; Burck Bailey and Warren F. Bickford of Fellers, Snider,

Blankenship, Bailey & Tippens, Oklahoma City, Oklahoma, adopted by reference briefs of all Defendants-Appellees, for Defendant-Appellee Don Sparkman), of Seymour Law Firm, Tulsa, Oklahoma, for Defendants-Appellees.

Before **O'BRIEN,** Circuit Judge, **BRORBY**, Senior Circuit Judge, and **LUNGSTRUM**, District Judge.[*]

---

**BRORBY**, Senior Circuit Judge.

---

The government appeals the district court's dismissal of its indictment on statute of limitations grounds. The indictment charged certain companies and five company officers with "execut[ing] and attempt[ing] to execute a scheme to defraud the United States and to obtain money from the United States by false pretenses" in violation of the Major Fraud Act, 18 U.S.C. § 1031(a). Exercising jurisdiction under 18 U.S.C. § 3731 and 28 U.S.C. § 1291, we affirm.[1]

## I.  Background

We recite the following factual allegations as they appear in the superseding indictment. The United States Army Corps of Engineers awarded

---

[*] The Honorable John W. Lungstrum, United States District Judge for the District of Kansas, sitting by designation.

[1] We deny the appellees' motion to strike the government's brief and dismiss this appeal.

North American Construction Corporation a fixed price contract to construct a groundwater treatment facility. Part of the construction required drilling wells, which North American subcontracted to CH&A Corporation. CH&A, in turn, subcontracted the "horizontal" well drilling portion of the contract to EVI Cherrington Environmental, Inc.

EVI drilled the horizontal wells but experienced cost overruns. In order to recover these additional costs, North American, with the aid of EVI and CH&A, submitted a certified claim for equitable adjustment to the chief contracting officer of the Corps on May 16, 1994. The companies sought almost $ 4 million, claiming the geological conditions encountered during drilling "were different than those represented by the government's specification on which EVI had based their [sic] bid." According to the companies' claim, the Corps' misrepresentations "caused the project to run longer than had been anticipated" and caused the companies to incur the "excess costs." The companies met with the Corps on June 28, 1995, "to promote and support" their claim.

On February 15, 2002, over seven years after the companies initially filed their claim, the government filed an indictment in district court, and later filed a superseding indictment, charging the companies and certain of their officers

(collectively "the Companies") with "execut[ing] and attempt[ing] to execute a scheme to defraud the United States and to obtain money from the United States by means of false pretenses" in violation of the Major Fraud Act. *See* 18 U.S.C. § 1031(a). The indictment alleged the Companies submitted a "false Claim for Equitable Adjustment." It asserted the Companies knew "there were no material differences between [the Corps'] representations in the bid package and the actual conditions encountered." It also alleged the Companies intentionally withheld from their claim a report prepared by EVI concluding the Corps provided information that "would have correctly warned a prospective horizontal driller of the hard drilling conditions ultimately encountered."

In response, the Companies filed motions to dismiss the indictment, arguing "the statute of limitations for the charged offense expired before the original Indictment was returned." The relevant statute of limitations requires the government to commence a prosecution within seven years after an offense is committed. *See* 18 U.S.C. § 1031(f). Since the government returned the indictment more than seven years after the Companies filed the claim for equitable adjustment, the Companies argued the "action was commenced outside the limitations period, and therefore, must be dismissed."

The district court agreed with the Companies' argument and concluded the statute of limitations began running when the Companies filed their claim for equitable adjustment on May 16, 1994. The district court therefore concluded the government commenced its prosecution outside of the limitations period by returning the indictment roughly nine months after the limitations period expired. (Apt. App. at 139.) As a result of these conclusions, the district court granted the Companies' motions and dismissed the indictment. The government appeals.[2]

## II. Discussion

On appeal, the government argues the district court incorrectly dismissed the indictment on statute of limitations grounds. We review this question de novo. *United States v. Thompson*, 287 F.3d 1244, 1248-49 (10th Cir. 2002); *Foutz v. United States*, 72 F.3d 802, 804 (10th Cir. 1995). We test the indictment "solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994).

---

[2] We granted the government's motion to dismiss this appeal against North American and EVI (CH&A was not a party), leaving only the individual defendants as parties to this appeal. For purposes of clarity and continuity, however, we continue to refer to the individual defendants collectively as "the Companies" for the remainder of this opinion.

The statute of limitations under the Major Fraud Act states: "A prosecution of an offense under this section may be commenced any time not later than 7 years after the offense is committed, plus any additional time otherwise allowed by law." 18 U.S.C. § 1031(f). "[C]riminal statutes of limitation are to be liberally interpreted in favor of repose." *United States v. Marion*, 404 U.S. 307, 323 n.14 (1971). "Statutes of limitations normally begin to run when the crime is complete." *Pendergast v. United States*, 317 U.S. 412, 418 (1943). "A crime is complete as soon as every element in the crime occurs." *United States v. Payne*, 978 F.2d 1177, 1179 (10th Cir. 1992) (quotation marks and citation omitted).

Under the principles discussed above, the statute of limitations began running in this case when the Companies first "committed" or completed an offense under the Major Fraud Act. In order to determine when the Companies committed an offense, however, we must first determine what constitutes an offense under the Act.

In relevant part, the Act prescribes fines and imprisonment under certain circumstances for "[w]hoever knowingly executes, or attempts to execute, any scheme or artifice with the intent – (1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses,

-6-

representations, or promises." 18 U.S.C. § 1031(a).[3]  Under the plain language of

the Act, an offense is each knowing "execut[ion]" or "attempt[ed] execut[ion]" of

a scheme or artifice to defraud or obtain money by false pretenses.  *Id*.  Each act

in furtherance of a scheme does not constitute a separate offense, *see United*

*States v. Sain*, 141 F.3d 463, 473 (3d Cir.), *cert. denied*, 525 U.S. 908 (1998);

however, the Act contemplates prosecution of multiple counts when there are

multiple "executions" of a single scheme, *see* 18 U.S.C. § 1031(c) (imposing a

maximum fine for "a prosecution with multiple counts under this section").  This

reading of the Act is consistent with this and other circuits' interpretation of the

---

[3]  In full, the Act provides:

Whoever knowingly executes, or attempts to execute, any scheme or
artifice with the intent –

    (1) to defraud the United States; or

    (2) to obtain money or property by means of false or fraudulent
pretenses, representations, or promises,

in any procurement of property or services as a prime contractor with
the United States or as a subcontractor or supplier on a contract in
which there is a prime contract with the United States, if the value of
the contract, subcontract, or any constituent part thereof, for such
property or services is $1,000,000 or more shall, subject to the
applicability of subsection (c) of this section, be fined not more than
$1,000,000, or imprisoned not more than 10 years, or both.

18 U.S.C. § 1031(a).

nearly identical language found in the bank fraud statute, 18 U.S.C. § 1344.[4] *See*

*United States v. De La Mata*, 266 F.3d 1275, 1287 (11th Cir. 2001), *cert. denied*,

535 U.S. 989 (2002); *United States v. Colton,* 231 F.3d 890, 908-09 (4th Cir.

2000); *United States v. Bruce*, 89 F.3d 886, 889 (D.C. Cir. 1996); *United States v.

Harris,* 79 F.3d 223, 232 (2d Cir.), *cert. denied*, 519 U.S. 851 (1996); *United

States v. Longfellow*, 43 F.3d 318, 323 (7th Cir. 1994), *cert. denied*, 515 U.S.

1122 (1995); *United States v. Wall,* 37 F.3d 1443, 1446 (10th Cir. 1994); *United

States v. Molinaro*, 11 F.3d 853, 860 (9th Cir. 1993); *United States v. Lilly*, 983

F.2d 300, 304 (1st Cir. 1992); *United States v. Heath,* 970 F.2d 1397, 1402 (5th

Cir. 1992); *United States v. Schwartz*, 899 F.2d 243, 248 (3d Cir. 1990).

---

[4]  The bank fraud statute provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice –

    (1) to defraud a financial institution; or

    (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representation, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.

Although the Act criminalizes each knowing "execution" or "attempted execution" of a scheme, the Act does not define these terms. Nevertheless, case law interpreting the term "execution" in the bank fraud context provides some guidance. In determining what constitutes an "execution," a court should first "'ascertain the contours of the scheme.'" *Wall*, 37 F.3d at 1446 (quoting *United States v. Rimell*, 21 F.3d 281, 287 (8th Cir. 1994)). A court should then determine the conduct necessary to "execute" or complete the scheme. *Id*. "[W]hether [conduct] is an 'execution' of the scheme or merely a component of the scheme will depend on several factors including the ultimate goal of the scheme, the nature of the scheme, the benefits intended, the interdependence of the acts, and the number of parties involved." *De La Mata*, 266 F.3d at 1288. Other factors the court may consider include whether the conduct created a "new and independent" financial risk, *United States v. Allender*, 62 F.3d 909, 913 (7th Cir. 1995), *cert. denied*, 516 U.S. 1076 (1996); *De La Mata*, 266 F.3d at 1288, or involved "a new and independent obligation to be truthful," *Molinaro*, 11 F.3d at 861 n.16. Essentially, the conduct constituting an "execution" will "depend on the particular facts" of each case. *Wall*, 37 F.3d at 1446.

Applying these principles to the facts of this case, we agree with the district court that the Companies "executed" their alleged scheme to defraud and obtain

money from the government when they filed their claim for equitable adjustment on May 16, 1994. The Companies' alleged scheme was to "fraudulently seek [almost four million dollars] from the United States" by certifying and submitting "a false Claim for Equitable Adjustment." Once the Companies filed their claim, they did not need to engage in any additional conduct to realize the ultimate goal of their scheme – the receipt of four million dollars from the government.[5] At this point the Companies' conduct first created a financial risk to the government

---

[5] The government asserts the Companies' subsequent actions were a necessary part of the scheme and therefore part of the execution. The government argues the Companies "were aware that their scheme could not succeed until they and the government had taken additional steps to process the claim," *i.e.*, the government "had to conduct an audit" and the Companies had "to persuade the Corps ... to accept the merits of their claim for reimbursement." In support of this assertion, the government relies on affidavits the district court did not consider. This it cannot do. Absent an exception not relevant here, "[a]n indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *Hall*, 20 F.3d at 1087. "Courts should refrain from considering evidence outside the indictment when testing its legal sufficiency." *Id.* Although the indictment in this case mentions the Companies' efforts to "promote and support" their claim as part of the scheme, there is nothing in the indictment that states these efforts were a necessary part of the scheme. To the contrary, the indictment states *the Companies* "request[ed]" a meeting with the Corps "to promote and support" their claim. On the basis of the indictment, we conclude the Companies did not need to engage in any conduct except filing the claim to realize the ultimate goal of their scheme.

The government also asks us to leave certain factual questions, including the issue above, for the jury to resolve at trial. We reject this request because, as discussed above, we test the indictment "solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *Id.*

-10-

and involved an obligation to be truthful.  We therefore conclude the Companies "executed" their scheme on May 16, 1994, and the statute of limitations began running on this date.

The government nonetheless argues for various reasons it filed the indictment within the statute of limitations period.  We divide this argument into three parts and address each in turn:  (a) the Companies' conduct was an "attempt to execute" a scheme to defraud or obtain money that was underway during the Companies' June 28, 1995, meeting with the Corps; (b) the Companies' conduct was an "execution" of a scheme to defraud or obtain money that continued at least until their 1995 meeting with the Corps; and (c) the 1995 meeting with the Corps was an independent "execution" or "attempted execution" of a scheme to defraud or obtain money.

## A.  An Attempted Execution

The government argues the Companies' entire course of conduct was an "attempted execution" of a scheme to obtain money by false pretenses because "there is no doubt that a scheme to obtain money by false representations is executed when it is completed, that is, when money is obtained."  According to

the government, "the collective steps leading to obtaining a sum of money by false representations will be a single attempt, until the money is obtained and the attempt merges with the substantive offense." Under the facts of this case, the government believes the Companies' "attempt offense was first committed not later than the filing of the claim" and "was underway at the time of the June 28, 1995 ... meeting." We reject the government's argument.

The language of the Major Fraud Act does not support the government's cramped definition of an "execution" of a scheme to obtain money by false pretenses.[6] In relevant part, the Act punishes "[w]hoever knowingly executes, or attempts to execute, any scheme or artifice with the intent ... to obtain money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1031(a)(2). The Act does not define an execution as the receipt of money by false pretenses. Instead, the Act punishes the execution of a scheme "with the intent to obtain

---

[6] The government argues "the rule of lenity counsels that the execution of a scheme to obtain money by false representations is committed when some of that money is obtained." The rule of lenity states that "'[w]hen the intent of Congress as to the unit of prosecution cannot be clearly discerned, doubt must be resolved in favor of lenity.'" *United States v. Jones*, 841 F.2d 1022, 1023 (10th Cir. 1988) (quoting *United States v. Valentine*, 706 F.2d 282, 293 (10th Cir. 1983)). "Consequently, ambiguity in the definition of conduct to be punished must be settled against turning a single transaction into multiple offenses." *Id*. The rule of lenity does not apply in this case, however, because the statute is not ambiguous.

money." *Id*. If we were now to conclude an execution requires the receipt of money, the phrase "with the intent to obtain money" would become largely superfluous with respect to executed schemes. We must avoid this result. *See United States v. Collins*, 313 F.3d 1251, 1254 (10th Cir. 2002).[7]

The government nevertheless argues "[t]he bank-fraud cases are consistent with [its] view."[8] For example, it extracts language from a Seventh Circuit case stating "[t]he execution of the fraudulent scheme is complete upon the movement of money, funds, or other assets from the financial institution." *United States v. Anderson*, 188 F.3d 886, 891 (7th Cir. 1999) (citing *United States v. Christo*, 129

---

[7] The government has its own concern about part of the Major Fraud Act becoming superfluous. It argues that "[i]f ... each significant constituent act is itself an 'execution' of the scheme to obtain money, there would not seem to be any rationale for Congress to have specified that an attempted execution also was an offense." We do not hold, however, that each significant constituent act is an "execution" of a scheme to obtain money by false pretenses. We hold only that an individual need not actually obtain money in order to "execute" a scheme.

[8] The government does direct us to one case involving the Major Fraud Act, *United States v. Sain*, 141 F.3d 463 (3d Cir. 1998). In that case, the Third Circuit held an indictment charging defendants with multiple "executions" of a scheme was not multiplicious. *Id*. at 473. In reaching this conclusion, the court noted: "There is no evidence that the defendants had determined a specific amount of money that they wanted to obtain and took several steps to get that single amount." *Id*. We fail to see how this language supports the government's contention an "execution" of a scheme to obtain money does not occur until the money is actually obtained.

-13-

F.3d 578, 580 (11th Cir. 1997)). The Seventh Circuit also recognized in this case, however, "the crime of bank fraud is complete when the defendant places the bank at a risk of financial loss, and not necessarily when the loss itself occurs." *Anderson*, 188 F.3d at 888. In any event, we believe the cases cited by the government are inapposite. While the movement of money may be a useful factor to consider in determining whether an indictment is multiplicious, *see United States v. Mancuso*, 42 F.3d 836, 847-48 (4th Cir. 1994); *United States v. Brandon*, 17 F.3d 409, 422 (1st Cir. 1994); *Lilly*, 983 F.2d at 305; *United States v. Saks*, 964 F.2d 1514, 1519, 1526 (5th Cir. 1992), and may be evidence indicating an "execution" is complete under the facts of a particular case, *Anderson*, 188 F.3d at 891; *Christo*, 129 F.3d at 580, these cases do not go so far as to hold a movement of money must occur in order for an individual to "execute" a scheme under the Bank Fraud Act. Consequently, these cases do not support the government's offered definition of an execution under the Major Fraud Act. In any event, we continue to believe the government's argument is contrary to the plain language of the Major Fraud Act. The Companies did not need to receive money to execute a scheme to obtain money by false pretenses under 18 U.S.C. § 1031(a)(2).

The government also suggests the Companies' conduct was an attempt to

execute a scheme to defraud the United States under 18 U.S.C. § 1031(a)(1). We reject this argument for substantially the same reasons we reject the government's attempted execution argument under 18 U.S.C. § 1031(a)(2). The Act does not require an individual to actually obtain money in order to "execute" a scheme to defraud the United States, *see* 18 U.S.C. § 1031(a)(1), and this reading of the statute is supported by case law in the bank fraud context which consistently holds an individual need only put a bank at a risk of loss in order to "execute" a scheme to defraud, *see, e.g., United States v. Young,* 952 F.2d 1252, 1257 (10th Cir. 1991) ("To support a § 1344 conviction the government does not have to prove the bank suffered any monetary loss, only that the bank was put at potential risk by the scheme to defraud.").

We conclude the Companies did not need to actually obtain any money in order to "execute" their scheme to defraud the United States or obtain money by false pretenses. Under the facts of this case, the Companies "executed" their scheme to defraud or obtain money when they first placed the government at a risk of financial loss upon filing their claim for equitable adjustment in 1994.[9]

---

[9] We note our decision in *United States v. Sapp*, 53 F.3d 1100, 1103 (10th Cir. 1995), *cert. denied*, 516 U.S. 1082 (1996), where we held "the government need not prove that a defendant put a bank 'at risk' to sustain a conviction under [the Bank Fraud Act]." We do not decide here whether the government *must* show a risk, or a potential risk, of financial loss under the Major Fraud Act in

No further conduct was necessary for the Companies to "execute" their scheme. Accordingly, we decline the government's invitation to interpret the Companies' filing of the claim and subsequent actions as a single attempt to violate the Major Fraud Act.[10]

## B. A "Continued" Execution

In the alternative, the government acknowledges that the Companies first "executed" their scheme when they submitted their allegedly false claim, but it argues the offense "continued into the limitation period to include the June 28, 1995 meeting." In other words, the government argues the "execution of a scheme to defraud is a continuing offense." Under this analysis, the government

order to prove an individual "executed" a scheme to obtain money; however, we believe it is at least a factor that may be considered, much like the movement of money, in determining whether an "execution" occurred.

[10] Contrary to the government's argument, this holding is consistent with the bank fraud cases in this circuit, *see Young,* 952 F.2d at 1257, *Sapp,* 53 F.3d at 1103, and the bank fraud cases in several other circuits, *United States v. McNeil,* 320 F.3d 1034, 1039 (9th Cir.), *cert. denied,* 124 S. Ct. 111 (2003); *United States v. Everett,* 270 F.3d 986, 991 (6th Cir. 2001), *cert. denied,* 537 U.S. 828 (2002); *United States v. Briggs,* 965 F.2d 10, 12-13 (5th Cir. 1992), including the First and Seventh Circuits, *United States v. Moran,* 312 F.3d 480, 489 (1st Cir. 2002) ("[T]he bank ... need not have suffered actual loss so long as the requisite intent is established and the bank was exposed to a risk of loss."); *United States v. Moede,* 48 F.3d 238, 242 (7th Cir. 1995) ("It is sufficient the defendant intended to cause actual or potential loss to the financial institution.").

believes the indictment "was timely filed" because the statute of limitations did not begin to run until "the objective of the fraud [was] accomplished or the fraud [was] discovered." According to the government, it did not discover the fraud (and therefore the statute of limitations did not begin running) until sometime after the June 28, 1995 meeting. We disagree with the government's argument.

The term "'[c]ontinuing offense' is a term of art that does not depend on everyday notions or ordinary meaning." *United States v. Jaynes*, 75 F.3d 1493, 1506 (10th Cir. 1996) (quotation marks and citation omitted). It "is not the same as a scheme or pattern of illegal conduct." *Id*. "Separate offenses may be part of a common scheme without being 'continuing' for limitations purposes." *Id*. at 1506 n.12. Rather, "[a] continuing offense is one which is not complete upon the first act, but instead continues to be perpetuated over time." *De La Mata*, 266 F.3d at 1288. "[T]he continuing offense doctrine applies only where it is contended that the actual conduct of the defendant ended but the crime continued past that time, not where ... the charged criminal conduct itself extends over a period of time." *Jaynes*, 75 F.3d at 1507 (quotation marks and citation omitted).

The Supreme Court discussed when a court should consider an offense "continuing" for statute of limitations purposes in *Toussie v. United States*, 397

U.S. 112 (1970). The Court stated "criminal limitations statutes are to be liberally interpreted in favor of repose" and "[s]tatutes of limitations normally begin to run when the crime is complete." *Id*. at 115 (quotation marks and citations omitted). The Court instructed that "the doctrine of continuing offenses should be applied in only limited circumstances since ... [t]he tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent." *Id.* (quotation marks and citation omitted). The former fixes a time limit by which the government must prosecute an individual following the occurrence of a criminal act, and "the latter, for all practical purposes, extends [this time limit] beyond [the statutory] term." *Id*. As a result, the Supreme Court held a court should not construe an offense as a "continuing offense" unless (1) "the explicit language of the substantive criminal statute compels such a conclusion"; or (2) "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Id*.

No circuit court has addressed whether the "execution" of a scheme to defraud or obtain money is a "continuing offense" for statute of limitations purposes under the Major Fraud Act; however, the Ninth Circuit addressed this question under the bank fraud statute. *United States v. Najjor*, 255 F.3d 979, 983-84 (9th Cir. 2001), *cert. denied*, 536 U.S. 961 (2002). The court in *Najjor* held

-18-

that the "execution" of a scheme to defraud or obtain money "is a continuing offense" for statute of limitations purposes; therefore, the statute of limitations on bank fraud begins to run when the last act "in furtherance of the scheme" is committed. *Id.* at 983. The *Najjor* holding was based on a previous Ninth Circuit case, *United States v. Nash*, 115 F.3d 1431 (9th Cir. 1997), *cert. denied*, 522 U.S. 1117 (1998), which held bank fraud was a "continuing offense" for ex post facto purposes because the language of the statute so suggested by punishing "the execution of the overall scheme" rather than each individual act. *Id.* at 1441.[11]

We are not persuaded by the Ninth Circuit's reasoning. Following the Supreme Court's analysis in *Toussie*, we hold the "execution" of a scheme under the Major Fraud Act is not a "continuing offense" for statute of limitations purposes. Nothing in the "explicit language" of the Act "compels" the conclusion that the offense is "continuing." *Toussie*, 397 U.S. at 115. If Congress intended the "execution" of a scheme to be a "continuing offense," "it could have clearly stated so." *United States v. Dunne*, 324 F.3d 1158, 1164 (10th Cir. 2003). *See, e.g.*, 50 U.S.C. § 856 ("Failure to file a registration statement ... is a continuing

---

[11] *Nash* notes one earlier Ninth Circuit case treating a Bank Fraud Act offense as a continuing offense, *United States v. Hutchinson*, 22 F.3d 846, 854 (9th Cir. 1993). *Nash*, 115 F.3d at 1441. However, as *Nash* recognizes, *Hutchinson* "[did] not discuss the issue." *Id.* (citing *Hutchinson*, 22 F.3d at 854).

offense for as long as such failure exists, notwithstanding any statute of limitation or other statute to the contrary.").

Furthermore, the nature of a Major Fraud Act violation does not "assuredly" indicate Congress intended it to be a "continuing offense." *Toussie*, 397 U.S. at 115. In making this determination, it is helpful to consider whether the offense is discrete in nature. *Compare United States v. Bailey*, 444 U.S. 394, 413 (1980) (holding Congress intended the crime of escape from federal custody to be a "continuing offense" because of the "continuing threat to society posed by an escaped prisoner") *with Toussie*, 397 U.S. at 116-22 (holding Congress did not intend the crime of failing to register for the draft to be a "continuing offense" because the crime was complete when a male failed to register during the five-day registration period). If a crime is discrete, it is less likely Congress "assuredly intended" the crime to be a "continuing offense." *See Toussie*, 397 U.S. at 122-23; *Nash*, 115 F.3d at 1441. As we have already determined, the Major Fraud Act criminalizes each discrete "execution" of a scheme rather than the scheme in its entirety. Once an "execution" is complete, the crime has ended, and additional acts do not violate the statute unless they independently constitute a separate "execution" or "attempted execution" of a scheme. *See id*. at 1290. The discrete nature of a Major Fraud Act violation makes it unlikely Congress intended it to be

a continuing offense for statute of limitations purposes.

The government argues a Major Fraud Act violation is a "continuing offense" because the "threat to the government posed by an execution of a scheme to defraud ... continues during the entire period the fraud is perpetrated." In support of this argument, the government notes it "continu[es] to rely on the fraudulent representations until [it] succumbs to the object of the fraud," *i.e.*, it pays the "money that is the object of the fraud." We reject this argument because it conflicts with the plain language of the Major Fraud Act. The Act punishes each "execution" or "attempted execution" of a scheme rather than the scheme in its entirety or each act in furtherance of a scheme. *See* 18 U.S.C. § 1031(a). Although conduct in furtherance of a scheme may perpetuate a fraud, the Act does not punish the conduct unless it constitutes an "execution" or "attempted execution" of a scheme. *Id*. We will not extend the Act to punish conduct not expressly covered by the Act. Once the scheme is "executed," the crime has ended, and additional conduct in furtherance of the scheme does not extend the statute of limitations for that particular "execution."[12]

---

[12] In support of its argument, the government cites a few cases where there was one "execution" but where conduct constituting the execution occurred over a period of time. *See Colton*, 231 F.3d at 910; *United States v. Duncan*, 42 F.3d 97, 104 (2d Cir. 1994). We do not believe these cases are inconsistent with our determination that a violation of the Major Fraud Act is not a "continuing

The government points to cases in other circuits holding violations of the wire fraud, bank fraud, and mail fraud statutes are continuing for venue purposes. *See United States v. Pace*, 314 F.3d 344, 350 (9th Cir. 2002); *United States v. Scott*, 270 F.3d 30, 34-36 (1st Cir. 2001), *cert. denied*, 535 U.S. 1007 (2002); *United States v. Loe*, 248 F.3d 449, 465 (5th Cir.), *cert. denied*, 534 U.S. 974 (2001). We are not persuaded for two reasons. First, Congress specifically stated "any offense involving the use of the mails ... is a continuing offense" for venue purposes. 18 U.S.C. § 3237(a). Second, and more importantly, the "continuing offense" analysis for venue purposes is "obviously different" from the "continuing offense" analysis for statute of limitations. *Dunne*, 324 F.3d at 1166. *See also Toussie*, 397 U.S. at 121 n.16. None of the cases cited by the government apply the *Toussie* analysis. Instead, consistent with the general venue statute,[13] these cases focus on geographic factors, *i.e.*, whether the defendant began, continued, or completed the offense in more than one geographic location. *See Pace*, 314 F.3d at 350-51; *Scott*, 270 F.3d at 36; *Loe*, 248 F.3d at 465. An offense may begin, continue, or end in different locations without qualifying as a

_____

offense" for statute of limitations purposes because, as discussed above, the statute of limitations does not begin to run until an execution is complete.

[13] The general venue statute establishes venue "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a).

"continuing offense" for statute of limitations purposes. *See, e.g., Dunne*, 324 F.3d at 1166 (concluding a violation of the Securities Exchange Act, 18 U.S.C. § 1001, is not a "continuing offense" for statute of limitations purposes even though it may be "continuing" for venue purposes). Even assuming these circuits reached the correct result,[14] we conclude the analysis in these particular cases is not dispositive because of the discrete nature of an offense under the Major Fraud Act. *Cf. id.*[15]

The government also argues the restraint called for in *Toussie* is

---

[14] In this case, we need not decide whether we agree that violations of the bank fraud and wire fraud statutes are continuing for venue purposes.

[15] For similar reasons, we are not persuaded by the government's citation to cases in the Eighth and Sixth circuits that hold violations of the mail fraud and bank fraud statutes are continuing for ex post facto purposes. *See United States v. Blumeyer*, 114 F.3d 758, 766 (8th Cir.) (noting mail fraud is a continuing offenses for ex post facto purposes), *cert. denied*, 522 U.S. 938 (1997); *United States v. Buckner*, 9 F.3d 452, 454 (6th Cir. 1993) (holding a violation of the bank fraud statute is a continuing offense for ex post facto purposes). *But see United States v. Barger,* 178 F.3d 844, 847 (7th Cir. 1999) (holding a violation of the mail fraud statute is not a continuing offense for ex post facto purposes); *United States v. Ortland,* 109 F.3d 539, 546-47 (9th Cir.) (same), *cert. denied*, 522 U.S. 851 (1997); *United States v. Miro*, 29 F.3d 194, 198 (5th Cir. 1994) (same); *United States v. Bakker*, 925 F.2d 728, 739 (4th Cir. 1991) (noting mail and wire fraud are not ongoing crimes that can "straddle" the effective date of the sentencing guidelines). Both circuits held violations of the statutes were continuing with little or no analysis, and neither circuit cited, much less applied, the *Toussie* analysis.

inapplicable here. The government claims "there is no tension between the purposes of the limitation period and application of the continuing-offense doctrine" because "Congress specifically intended" to toll the limitations period during a period of fraudulent concealment. The government points to a portion of the Act's legislative history in support of its argument.[16] *See* S. Rep. No. 100-503, at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5969, 5978. Even assuming the government correctly discerns Congress's intent, such a rule would toll the limitations period only during periods of fraudulent concealment and not upon every act in furtherance of a scheme. Therefore, the tension between the limitations period and the doctrine of continuing offenses still exists. Furthermore, if, as the government argues, there is solid evidence indicating Congress' intent as to what circumstances toll the limitations period, we believe the absence of evidence that Congress intended courts to consider the offense a "continuing offense," or at least that every act in furtherance of a scheme tolls the limitations period, lends support to our conclusion that a violation of the Major

___

[16] Incidentally, the government acknowledges it "did not assert the doctrine of fraudulent concealment in the district court as a ground for holding, on the facts of this particular case, that the statute of limitation did not begin to run." It also disavows any assertion on appeal of "a plain error argument that [the] indictment was timely due to tolling of the limitation period." We therefore do not consider whether the Companies' conduct tolled the limitations period under a doctrine of fraudulent concealment.

Fraud Act is not a "continuing offense."  In any event, we are convinced the language of the Major Fraud Act dictates our conclusion in this case.

We therefore conclude an "execution" of a scheme to defraud or obtain money is not a "continuing offense" for statute of limitations purposes.[17]  Under the facts of this case, the statute of limitations began running when the Companies "executed" their scheme on May 16, 1994.  The Companies' subsequent meeting with the Corps in 1995 was not a "continuation" of their "execution"; the "execution" was already committed or complete once the Companies filed their claim.  The 1995 meeting was merely an act in furtherance of the scheme which did not extend the limitations period.  Although the scheme may have continued, the Act does not punish the scheme but only the "execution."

### C.  An Independent Execution Or Attempted Execution

_____

[17]  The government again argues the rule of lenity "support[s] the conclusion that an execution of a scheme to defraud ... continues as a single offense until the object of the fraud is accomplished or the fraud is discovered"; otherwise, a defendant may be liable for "multiple executions of the scheme to defraud."  We have already concluded, however, the statute unambiguously punishes each "execution" of a scheme and indicates a particular scheme may be "executed" (and therefore punished) multiple times; the rule of lenity does not apply under these circumstances. *Jones*, 841 F.2d at 1023.

Finally, the government argues the Companies "committed a separate offense [under the Major Fraud Act] at the June 28, 1995 meeting." The government claims the Companies committed a separate offense at this meeting because (1) their "false representations [at the meeting] ... significantly increased the risk that the claim would be paid," and (2) "[t]he Corps detrimentally relied on [their] misrepresentations to continue processing the claim, which entailed an expenditure of time and money." Once again, we reject the government's argument.

Nowhere does the superseding indictment allege the 1995 meeting was a separate "execution" or "attempted execution" of a scheme. Instead, the superseding indictment alleges the Companies arranged the meeting with the Corps in order "to support and promote their claim" for equitable adjustment, *i.e.*, the Companies wanted to increase the likelihood the Corps would pay their claim. The meeting did not concern any other claims. It therefore did not create a new and independent financial risk to the government or create a new and independent obligation to be truthful. Nor did the meeting constitute a substantial step towards a new and independent "execution." Although the Companies' alleged misrepresentations at the meeting may have increased the likelihood the Corps would pay the claim, the financial risk to the government was not new or

independent of the risk the Companies created by filing their claim for equitable adjustment in the first place. Likewise, the Companies' obligation to be truthful at this meeting derived from, or was an extension of, its initial obligation to tell the truth when they filed the claim.

As a result of the language in the indictment, we conclude the 1995 meeting was not an independent "execution" or "attempted execution"; it was merely an act in furtherance of the Companies' scheme to defraud the United States or obtain money from the United States. Although, according to the government, the Companies' conduct "was not innocent," the conduct is not an independent offense under the Major Fraud Act.

### III. Conclusion

For the reasons discussed above, we conclude the statute of limitations began running in this case when the Companies filed their claim for equitable adjustment on May 16, 1994. Since the government waited until February 15, 2002, to return an indictment, it did not commence this action within the seven year limitations period. The district court's decision dismissing the indictments is therefore **AFFIRMED**.